758

In the Matter of the Estate of LEO K. MCMANUS, Deceased. JOSEPH M. MCMANUS, SR., Appellant; VIRGINIA A. MC-MANUS, as Executrix of LEO K. MCMANUS, Deceased, Respondent.

In the Matter of the Estate of MARY F. MCMANUS, Deceased. JOSEPH M. MCMANUS, SR. et al., Appellants; LEO K. MCMANUS, as Executor of MARY F. MCMANUS, Deceased, Respondent.

Second Department, June 26, 1978

### APPEARANCES OF COUNSEL

*Foley, Hickey, Gilbert & Power (Terrence P. O'Reilly* of counsel), for appellants.

*Keenan, Powers & Andrews (Edward S. Andrews* of counsel; *Authur J. Powers* on the brief), for respondents.

### OPINION OF THE COURT

HOPKINS, J. P.

In 1935 John J. McManus died, leaving a will whose provisions create the controversy presented by this appeal. At the time of his death the decedent owned the 10 outstanding shares of John J. McManus & Sons, Inc. (McManus & Sons), which owned and operated an undertaker's and funeral business. He named Mary V. McManus, his wife, as the executrix and trustee under the will. He bequeathed four of the 10 shares owned by him to Mary in trust for his son, Joseph M. McManus (one of the petitioners), to be held by Mary during Joseph's lifetime. The will provided that Mary was to collect and pay over the income and dividends accruing to Joseph, subject to the right of Mary, as trustee, to sell the stock "at any time during the life of my said son, when in her sole discretion such sale shall be for the benefit of my said son and thereupon to pay over to him the proceeds of said sale." If the stock remained unsold at the time of Joseph's death, the will directed that the stock should be sold and the proceeds paid to the distributees of Joseph or to the persons named by Joseph

in his will.[1] The remainder of his property, including the other six shares of stock in McManus & Sons, was given to Mary.

Aloysius McManus and Leo McManus were brothers of Joseph and the three of them had been associated with their father in the operation of the business. In 1941 certain significant events occurred: (1) on April 10 Mary, as trustee, transferred the four shares of stock to Lawrence P. Murphy, ostensibly for the sum of $2,000;[2] (2) on April 15 Murphy transferred the four shares of stock to Joseph; (3) on April 15 Mary transferred three shares of stock to Aloysius and three shares of stock to Leo, thus ridding herself of the six shares given to her under the will; (4) on April 15 Jalm Realty, Inc. (Jalm) was formed and shortly thereafter acquired title to the real property where the business was conducted; (5) the stock of Jalm was issued in equal shares to Joseph, Aloysius and Leo; and (6) on April 29 Joseph, Aloysius and Leo executed stockholders' agreements with respect to the stock of McManus & Sons and Jalm.

The two stockholders' agreements were nearly identical and provided that on the death of a party the stock owned by him shall be offered to the surviving parties at book value. On December 11, 1961 the agreements were amended by the parties so as to substitute a formula for the establishment of the purchase price of the stock.

Aloysius died in 1962. By agreement dated April 18, 1963 Joseph and Leo consented to the retention of Aloysius' shares by his wife (Mary F. McManus), Joseph was allowed to transfer his stock to his male children[3] and Mary F. McManus was

---

1. The precise language of the will reads: "SECOND: I give, devise and bequeath unto my Trustee hereinafter named four (4) shares of the common capital stock of JOHN J. MCMANUS AND SONS, INC., in trust, however, to hold the same and to collect the income and dividends accruing thereon and to pay the same over to my son, JOSEPH M. MCMANUS, for and during his natural life, subject however to the right which I hereby give to my said Trustee to sell said stock at any time during the life of my said son, when in her sole discretion such sale shall be for the benefit of my said son and thereupon to pay over to him the proceeds of said sale. Upon the death of my said son, JOSEPH M. MCMANUS, if said stock remains unsold, I direct my Trustee or her successor or successors to sell the said four (4) shares of stock and to pay over and distribute the proceeds thereof unto and among the distributees of my said son, JOSEPH M. MCMANUS, according to the intestate laws of the State of New York or to pay over or distribute said proceeds to the person or persons nominated to receive them by the last Will and Testament of my said son."

2. At the time of the settlement of John's estate, the four shares had been valued at $2,000.

3. Joseph subsequently transferred half of his interest in McManus & Sons and Jalm to his son, Joseph, Jr.

allowed to transfer her stock to her only son (John J. A. McManus). This she did by her will speaking as of the time of her death on December 11, 1973.[4]

On June 8, 1976 Leo died, leaving his estate to his wife (Virginia A. McManus). Joseph served a demand on the representatives of Aloysius' and Leo's estates to offer the stock held by them to him. Each demand was refused.

The Surrogate, after a trial, held that the transfer of the four shares of stock in McManus & Sons in 1941 was in violation of law and therefore nugatory. Moreover, the Surrogate held that the stockholders' agreements relating to McManus & Sons and Jalm must be rescinded, since the parties at the time of the making of the agreements mistakenly believed that Joseph was a legal stockholder of McManus & Sons.

We reverse and direct that the stock held in the name of Aloysius and Leo must be offered for sale to the petitioners (Joseph, Sr., and Joseph, Jr.) in accordance with the terms of the stockholders' agreements.

## I.

The respondents prevailed before the Surrogate by challenging the transfer of the four shares of stock to Joseph in 1941. Their argument, that the transfer violated the trust and public policy, rests on their interpretation of the language of the will and the terms of the statute (EPTL 7-1.5).

The will itself, without recourse to the public policy embodied in the statute, does not forbid, by direct words, the transfer of the stock to Joseph. The prohibitory effect urged by the respondents arises negatively, if at all—that is, the respondents contend that the trust for Joseph's benefit can be terminated during Joseph's lifetime only by a sale of the stock to a third party by the trustee and payment of the proceeds to Joseph. They thus derive their interpretation that the trust did not envision a transfer to Joseph individually, or a transfer to a third party who in turn would make a transfer to Joseph—a transaction which the respondents imply was an artifice to subvert the trust.

We do not think that the bare provisions of the will are susceptible of the interpretation that Joseph was for all time barred from stock ownership. As the will contemplated a sale

---

4. In 1975 John J. A. McManus filed a renunciation of the legacy of the shares of stock.

of the stock by the trustee whenever in her discretion it should be beneficial to Joseph, her exercise of the power to sell inevitably put the stock into the open market where the transfer would be free from any restraint against alienation of the stock to Joseph. In short, Joseph was not, by the terms of the trust, under any continuing disability to acquire the stock once it had reached the stream of commerce.

The record is unclear whether the transfer by the trustee to Murphy and the almost simultaneous transfer by Murphy to Joseph were devised to give a surface compliance with the trust, when the realities were, in effect, that the trustee was making a transfer directly to Joseph. The dates of the two transfers lend credibility to the respondents' claim that the parties' design was to achieve a transfer of the stock to Joseph. Nevertheless, we see nothing so reprehensible in the two transactions as to call upon the court's intervention to render them void because of an unproven illegal scheme between the trustee and Joseph to destroy the trust. The execution of the stockholders' agreements within days of the transfer makes clear that the signatories to the agreements were fully aware that the transfers had been made, since the three brothers had each acquired their shares of stock from their mother in her individual capacity or as trustee shortly before the date of the agreements.

## II.

The stronger of the respondents' contentions is that the statute interdicts the transfer. EPTL 7-1.5 (subd [a], par [1]) provides that "[t]he right of a beneficiary of an express trust to receive the income from property and apply it to the use of or pay it to any person may not be transferred by assignment or otherwise". Originally, this provision sprang from the 1830 revision of the New York statutes (Rev Stat of NY, part II, ch I, tit II, art 2, § 55, subd 3, and, later, Real Property Law, former § 103). Though its provisions are often called a "spendthrift" trust, intended to protect the beneficiary from his own improvidence, in truth the statute permits no inquiry into the motives of the settlor (cf. *Matter of Vought*, 25 NY2d 163, 170-171; Griswold, Spendthrift Trusts, [2d ed], § 67, p 51).

This view of the statute as a general rule finds support in the cases *(Matter of Wentworth*, 230 NY 176, 183-186; *Cuthbert v Chauvet*, 136 NY 326). *Matter of Wentworth (supra)*, indeed, provides the main prop for the respondents' position

on this appeal. In *Wentworth,* the will contained a trust for the benefit of the brother of the testatrix, whereby the trustee was to pay over the income received from the corpus from time to time as the needs of the beneficiary required, and such part of the principal as well as might be required; at the death of the beneficiary, the remainder of the corpus was to be paid over to the trustee personally. Upon consent of the beneficiary, the trustee conveyed the real property constituting the corpus in violation of the trust and, subsequently, the beneficiary received nothing from the trust. The Court of Appeals held that under the statute the consent of the beneficiary could not authorize an alienation of the corpus.[5]

■ ■ We do not think that *Wentworth* governs the facts at bar. Instead, we believe the case must be considered under a different aspect of the general rule. That is, that a power vested in the trustee under the terms of the trust to terminate the trust by paying over the principal to the beneficiary may be exercised by the trustee without infringing the statute *(Cushman v Cushman,* 116 App Div 763, affd 191 NY 505; *Major v Major,* 177 App Div 102; *Matter of Eckert,* 23 AD2d 32; *Matter of Fishberg,* 158 Misc 3). The court will not interfere in the exercise of discretion by the trustee unless he acts dishonestly, or from an improper motive, or unreasonably (4 Scott, Trusts [3d ed], § 334.1, p 2646).

*Cushman v Cushman (supra)* illustrates this aspect of the rule. The testator left his entire estate in trust for the benefit of his three sons, who were to receive the income equally; at the time any son attained the age of 25 years, the trustee was empowered to pay over a part of the corpus, if in the opinion of the trustee the son had good moral habits and was competent to manage the property. Though the trustee paid two of the sons their share of the corpus, one son was never paid his share and his executrix sued to recover it. The court held that the discretion exercised by the trustee should not be disturbed.

In *Matter of Fishberg (supra),* the trustee was directed to pay the income to the widow of the testator until his daughters attained the age of 30 years, at which time each would be entitled to an equal share; in the event either daughter married before reaching that age, the trustee was authorized

---

5. *Matter of Wentworth* is analyzed critically in 4 Scott, Trusts (3d ed), § 342.1, p 2728 (see, also, Griswold, Spendthrift Trusts [2d ed], § 525, pp 604-606).

to turn over to that daughter her share, on consent of the widow. The court said (p 6): "The statutes prohibiting the destruction of trusts to pay income to designated beneficiaries (Real Prop. Law, § 103; Pers. Prop. Law, § 15) do not bar the trustee from now terminating the trusts created in this will. These statutes were enacted to compel the carrying out of the intention of the person creating a trust—not to frustrate such intention. The testator expressly provided for complete as well as partial invasion at any time or times prior to the termination of the longest period he fixed as the duration of each trust. The trustee's power to terminate the trusts was lawfully given him by the testator and he may validly execute it in perfect accord with the testamentary intent."

Here the trustee in 1941 exercised the power to terminate the trust and her judgment cannot be assailed in the absence of bad faith or unreasonableness, neither of which appears in this record. The termination of the trust did not have, either under the statute or the will creating the trust, any lingering effect to disable the beneficiary from then or thereafter obtaining the shares of stock which constituted the original corpus. A contrary construction of the statute would perpetrate a continuing prohibition against the beneficiary by sterilizing the shares from his ownership, even though he participated in the operation of the business. We do not think that this result was within the contemplation of the testator or the intent of the statute.

The respondents also note that the statute invalidates any sale or conveyance by the trustee in contravention of the trust (see EPTL 7-2.4; *Cuthbert v Chauvet,* 136 NY 326, *supra)* and they argue that the transfer of the stock to Joseph was in violation of this provision. We do not perceive that the statutory prescription is any different from respondents' contention that the will did not provide for the transfer. This argument we have already discussed and found that no such inference of invalidity can be drawn from the terms of the trust. The statute, as the cases cited above indicate, permits a transfer by the trustee whenever, as here, the trust provisions endow the trustee with power to make a transfer under given circumstances.

### III.

Under the determination of the rights we now reach, it is unnecessary to consider the other contention of the petitioners

resting on estoppel. Since Joseph, Sr., might lawfully become the owner of the shares under the trust, the stockholders' agreements are enforceable and no mistake of law or fact was involved in their execution.

The decree should therefore be reversed and judgment granted for the relief demanded in the petitions.

LATHAM and SHAPIRO, JJ., concur with HOPKINS, J. P; MARTUSCELLO, J., dissents and votes to affirm the decree on the opinion of Surrogate BLOOM.

Decree of the Surrogate's Court, Kings County, entered October 31, 1977, reversed, on the law and the facts, without costs or disbursements, petitions granted, and it is directed that the stock in question be offered for sale in accordance with the stockholders' agreements.