■ In the Matter of the Estate of LEO K. McMANUS, Deceased. JOSEPH M. McMANUS, SR., Respondent; VIRGINIA A. McMANUS, as Executrix of LEO K. McMANUS, Deceased, Appellant. — In a proceeding to compel the executrix of the estate of Leo K. McManus to offer for sale certain stock in two closely held corporations in accordance with the provisions of the shareholders' agreements, the executrix appeals from an order of the Surrogate's Court, Kings County (Bloom, S.), dated June 23, 1980, which, *inter alia,* directed her to sell the stock held by the estate to the petitioner for the sum of $213,950. Order modified, on the law, by deleting therefrom the amount "$213,950" and substituting therefor the amount "$221,290.70". As so modified, order affirmed, with $50 costs and disbursements payable to petitioner out of the estate. Petitioner, Joseph M. McManus, Sr., is the last surviving original

shareholder of two closely held family corporations, John J. McManus & Sons, Inc., and Jalm Realty, Inc. The facts leading up to the present proceeding were ably set forth in an opinion by Mr. Justice Hopkins in *Matter of McManus* (62 AD2d 758, affd 47 NY2d 717). Upon remittitur from the Court of Appeals, the Surrogate decreed that Elizabeth Smith, as administratrix of the estate of Mary F. McManus, and Virginia McManus, as executrix of the estate of Leo K. McManus, are to specifically perform the "buy-sell" provisions contained in the two shareholders' agreements as amended. By separate notices dated October 18, 1979, both estates offered to sell their stock in the two corporations to petitioner. The appellant's offer provided: "In accordance with the stockholders agreements dated April 18th, 1963 the undersigned \*\*\* offers to you the entire interest of the Estate in [the two corporations] \*\*\* Your right to purchase said shares at the value determined in accordance with paragraph 'EIGHTH' of the subject agreements shall be exercised within sixty (60) days from the date of this offer." By letter dated December 14, 1979, the petitioner accepted the offer of the estate of Leo K. McManus. The letter simply provided: "This letter represents formal acceptance of your written offer to me dated October 18, 1979. Specifically, I hereby agree to purchase from the Estate of Leo K. McManus said estate's entire stock interest in [the two corporations], at a price to be computed in accordance with the shareholders agreements dated April 29, 1941, and all subsequent amendments thereto." It appears that the petitioner did not accept the offer of the estate of Mary F. McManus. On the day that petitioner sent his letter of acceptance to the appellant, counsel for the petitioner advised counsel for the appellant that (1) the estate would have to execute certain stock powers to facilitate the transfer of the stock, and (2) the petitioner will deliver a check in the amount of $213,950, representing payment for the estate's stock, as follows:

30 shares of John J. McManus
    & Sons, Inc. .............................$ 81,450
250 shares of Jalm Realty, Inc. ..................132,500

Total          $213,950.

Counsel for appellant was further advised that this price had been computed by the corporations' accountants in accordance with the shareholders' agreements. Five days later, appellant purported to reject the acceptance of the petitioner and withdrew her offer to sell the stock. She advised the petitioner that the price was insufficient and erroneously determined and that he has frustrated the intent of the shareholders' agreements by refusing to purchase the stock holdings of the estate of Mary F. McManus. Petitioner then sought to have the appellant's letters testamentary revoked. Although the Surrogate initially granted this motion, on reargument the court vacated its prior decree and substituted therefor an order directing her to sell the stock held by the estate to the petitioner for the sum of $213,950. It is from this order that the executrix is appealing. The Surrogate properly determined that a valid contract was created by the petitioner's acceptance of the estate's offer to sell the stock of the two corporations. Applying fundamental principles of contract law, it is apparent that the petitioner's letter of December 14, 1979 was an unqualified, seasonable expression of acceptance of appellant's offer of the stock at a price to be computed in accordance with the formula contained in the shareholders' agreements. Even though the offer and the acceptance omitted the price term, nevertheless an enforceable contract resulted. An agreement is not unenforceable for lack of definiteness of price if the parties specify a practicable method by which the price can be determined by the court without any new expressions by the parties themselves. (1 Corbin, Contracts, §§ 97-98; cf. *Sanitary Farm Dairies v Gammel,* 195 F2d 106 [option to sell shares of stock

at a price computed by reference to corporation's net earnings].) We reject the argument that the petitioner's acceptance did not mirror the offer of the appellant. An exact and unconditional acceptance of an offer is not afterward turned into a conditional acceptance or counteroffer so as to prevent the formation of a contract, by an improper interpretation of the terms of the agreement by one of the parties (1 Corbin, Contracts, § 84; *Killam v Tenney,* 229 Ore 134; cf. 1 Williston, Contracts [3d ed, Jaeger], § 79). "[I]f the acceptance of an offer is initially unconditional, the fact that it is accompanied with a direction or a request looking to the carrying out of its provisions, but which does not limit or restrict the contract, does not render it ineffectual or give it the character of a counteroffer" *(Valashinas v Koniuto,* 283 App Div 13, 17, affd 308 NY 233). Thus, even if we were to construe the petitioner's letter to the appellant together with the letter of his counsel to appellant's counsel, we would nevertheless conclude that petitioner's letter constituted a direct and unequivocal acceptance of the appellant's offer to sell the stock. The petitioner's letter and that of his counsel contained no new offer for the appellant to accept or reject (cf. *Orr v Doubleday, Page & Co.,* 223 NY 334, 338-340). Additionally, we note that pursuant to article 2 of the Uniform Commercial Code, the common-law mirror image rule has been abrogated with respect to transactions in goods (White & Summers, Uniform Commercial Code [2d ed], § 1-2). Section 2-207 of the code pertinently provides: "(1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms. (2) The additional terms are to be construed as proposals for addition to the contract." Thus, if the code is applicable, it becomes apparent that a binding contract was created between the parties. Article 2 of the Uniform Commercial Code is applicable to "transactions in goods" (Uniform Commercial Code, § 2-102). Subdivision (1) of section 2-105 of the code defines goods as "all things *** which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities (Article 8) and things in action." The official comment to this section explicitly recognized that the provisions of this article may be applied, by analogy, to securities (Uniform Commercial Code, § 2-105, Official Comment 1; see, also, *Agar v Orda,* 264 NY 248 [applying by analogy the provisions of the Uniform Sales Act to securities]). One court has gone as far as holding that article 2 of the code should be read in conjunction with article 8 and that the former article should apply where the latter is silent on the question *(Silverman v Alcoa Plaza Assoc.,* 37 AD2d 166). We can perceive of no sound policy reason why the provisions of section 2-207 should not be applied to the facts of this case. Thus, even if the petitioner's letter is construed as containing terms additional to or different from those contained in the appellant's offer, an enforceable contract results, with the additional terms deemed proposals for addition to the contract. Appellant further argues that the Surrogate erred in directing that the estate sell the stock to petitioner for the sum of $213,950. We agree. The price should be $221,290.70. The shareholders had previously agreed that: "[T]he formula to be used to compute the value for purposes of sale of stock to a surviving or remaining shareholder shall be: The net worth of the Corporation as shown by the closing statement prepared by the accountant of the Corporation for the last corporate fiscal year, plus the good will of the Corporation, valued at an amount equal to four times the amount by which the average annual net earnings of the Corporation, after taxes, for the preceding four full fiscal years, exceeded 6% of the average year-end net worth of the Corporation for those respective years, determined on a like basis but omitting good will as

a factor. The net worth of the Corporation as shown by the said closing statement and the net worth of the Corporation for the preceding four (4) fiscal years, shall be recomputed and adjusted to reflect any change in the value of any realty owned by the Corporation as compared to the value as set forth in the accountant's statement by an appraiser to be selected by the American Arbitration Association." In this proceeding, there is no dispute over the value of the stock of Jalm Realty; the parties are in agreement that it is valued at $132,500. The gravamen of the present dispute is over the value of the stock of John J. McManus & Sons, Inc. The corporation's accountant determined that the value of 30 shares (i.e., the estate's interest in the corporation) was $81,450, while the estate contends that the 30 shares are to be valued at $88,790.70. This disparity results from the estate's utilization of the corporation's average annual net earnings for the years 1971-1974, as opposed to petitioner's use of the net earnings for the years 1972-1975. In interpreting the words of a written agreement, the function of the court is to ascertain the intent of the parties as expressed in their writing (see, generally, 4 Williston, Contracts [3d ed, Jaeger], § 600A). While it appears that the use of the words "preceding four (4) full fiscal years" may refer to either the four years preceding the year of death or the four years preceding the year of the closing statement, this ambiguity is resolved in the second sentence of the formula. In this second sentence, the parties treat the net worth of the corporation as shown by the closing statement and the net worth of the corporation for the preceding four fiscal years as discrete elements. From this treatment it may be concluded that the parties contemplated the use of the corporation's net worth for the last corporate fiscal year and the average annual net earnings for the four full years preceding the last corporate fiscal year. Accordingly, we hold that the value of the stock of Joseph McManus & Sons, Inc., should have been computed by reference to the average annual net earnings for the years 1971-1974. In view of the fact that there is no dispute between the parties as to the value of the corporation if the year 1971 is employed, we are modifying the order accordingly. Lastly, we note that the Surrogate did not abuse his discretion in denying appellant's claim for interest on the purchase price from the date of the decedent's death (see CPLR 5001, subd [a]). Lazer, J. P., Margett, O'Connor and Thompson, JJ., concur.