**COMPANIA SUD–AMERICANA de VAPORES, S.A., Plaintiff,**

v.

**IBJ SCHRODER BANK & TRUST COMPANY, Defendant.**

**No. 90 Civ. 7220 (SWK).**

United States District Court, S.D. New York.

Feb. 24, 1992.

---

Curtis, Mallet–Prevost, Colt & Mosle, New York City by Eliot Lauer, for plaintiff.

Winthrop, Stimson, Putnam & Roberts, New York City by Edwin J. Wesely and Frederick A. Brodie, for defendant.

## MEMORANDUM OPINION AND ORDER

KRAM, District Judge.

In this case concerning foreign currency exchange transactions, plaintiff Compania Sud–Americana de Vapores ("CSAV") seeks to recover more than $1.5 million,

claiming fraud, breach of fiduciary duty, breach of contract and violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c) against defendant IBJ Schroder Bank & Trust Company ("Schroder"). Presently, Schroder moves for an order, pursuant to Rule 56 of the Federal Rules of Civil Procedure, granting it summary judgment on the grounds that CSAV's four claims are defective as a matter of law.[1]

## I. Background

CSAV is a Chilean company engaged in shipping goods to North and South America, Northern and Southern Europe and Asia. Its 1989 assets were worth $500 million dollars. Schroder is a banking institution with its principal place of business in New York. For many years, Schroder was one of CSAV's leading U.S. banks providing CSAV with credit and deposit services. CSAV also conducted foreign currency transactions with Schroder for more than forty years. At least between 1984 and 1990, these transactions between the parties proceeded as follows:

(1) Upon receipt of foreign currencies [2] in payment for CSAV's shipping services, CSAV's European agents remitted the funds to local European banks ("correspondent banks") where Schroder maintained foreign currency accounts ("nostro accounts").

(2) The correspondent banks, upon crediting Schroder's "nostro accounts" with CSAV's foreign currencies, would notify Schroder of the remittance by means of an interbank telex called a "SWIFT."

(3) Upon receipt of the SWIFT, Schroder's back office would notify a Schroder foreign exchange trader who would determine the rate that would be applied to the conversion.

(4) After determining the exchange rate, an internal transaction ticket would be completed, and the foreign exchange trader would generally place a phone call to a designated person, usually Henrietta Suttie, the Chief Accountant in the Finance Department of Chilean Line, Inc. ("Chilean Line"), CSAV's wholly-owned New York subsidiary.[3]

(5) In the phone call to Chilean Line, the Schroder trader informed CSAV of the contract number, the amount of foreign currency involved, the exchange rate to be applied, the U.S. dollar amount to be credited, and the "maturity date" or "value date" on which the U.S. dollars would be received.

---

1. In connection with Schroder's motion for summary judgment, the following officers of CSAV, its wholly-owned U.S. subsidiary Chilean Line, Inc., and Schroder, have been deposed, and their testimony will be referred to as necessary:

> Barry F. Geis—Chief Financial Officer of Chilean Line, Inc. since 1979 ("Geis Tr.");
> Patricio Grez—President of Chilean Line, Inc. since June of 1990 and, from 1982 to 1990, Manager of the Finance Division of CSAV in Chile ("Grez Tr.");
> Henrietta Suttie—Chief Accountant of Chilean Line, Inc. ("Suttie Tr.");
> Frederick Seeley—former head of the Latin American Division at Schroder and currently a paid advisor and consultant to CSAV ("Seeley Tr.");
> Edward Hamway—Senior Executive Vice President of Schroder and Acting President and Chief Executive Officer of Schroder from August 3, 1990 until January 1, 1991 ("Hamway Tr.");
> Paul Wan—Executive Vice President and, since 1986, Treasurer of Schroder ("Wan Tr.");

> Kevin Raphael—Head Foreign Exchange Trader at Schroder from 1984 to 1986 ("Raphael Tr.");
> Rodolfo Espinosa—Vice President and Head Foreign Exchange Trader at Schroder since 1987 ("Espinosa Tr.");
> Sara Settembrini—First Vice President at Schroder and from 1982 to 1985 account officer with responsibility for CSAV ("Settembrini Tr.");
> Horst Hasselbach—Assistant Vice President and Head of the Foreign Exchange Operations Department at Schroder ("Hasselbach Tr.").

2. According to the complaint, the principal foreign currencies received and converted by Schroder on behalf of CSAV were: the Belgian franc, the German deutsche mark, the Dutch guilder, the Danish krone, the Spanish peseta, the British pound sterling, the Norwegian krone, and the Swedish krona.

3. Chilean Line acted as CSAV's agent with regard to the currency conversions at issue in this case. Thus, both CSAV and Chilean Line will be referred to as CSAV.

(6) After receiving the phone call from Schroder, Chilean Line would send the information about the transaction to CSAV's head office in Chile by telex.

(7) Schroder sent written confirmations of each foreign exchange transaction to both CSAV in Chile and Chilean Line in New York. These confirmations included the amount of foreign currency, the exchange rate, the U.S. dollar amount and the value date.

(8) When the conversion was completed, Schroder paid CSAV the U.S. dollar proceeds of these foreign currency exchange transactions by depositing the dollar proceeds into CSAV's demand deposit account ("DDA account") at Schroder in New York.

(9) CSAV routinely transferred those dollars out of its account at Schroder and into its operations account at Chase Manhattan Bank ("Chase"). CSAV directed Schroder to wire-transfer funds to Chase an average of once a day.

According to the complaint, between 1984 and 1990, 1,087 foreign currency transactions were executed by Schroder on CSAV's behalf. Complaint, at ¶ 23. These transactions continued until mid–1990. In June 1990, however, CSAV decided to ask other European and American banks for quotations on foreign currency exchanges. After discovering that other banks had superior exchange rates, and complaining to Schroder about its foreign currency exchange rates,[4] CSAV took its foreign exchange business elsewhere, specifically to Deutsche Bank Hamburg, in July or August of 1990.

The instant action arises out of the above foreign currency exchange transactions. CSAV alleges that between January 1, 1984 and May 31, 1990, Schroder charged an exchange rate for the conversion of foreign currency into dollars that was "unreasonably and grossly in excess of the prevailing market rate of exchange at the

time, and well in excess of rates and margins being charged by other banking institutions." Complaint, at ¶ 18. According to CSAV, between January 1, 1984 and May 31, 1990, Schroder executed 175 separate conversions of the Belgian franc into dollars,[5] and the difference between the market rate and the rate charged by Schroder for this currency rose steadily throughout this period. For example, in 1984 Schroder charged an average of 1.35% above the New York Interbank rate (the "market rate" or "interbank rate"), the rate that applies between banks, for conversions of the Belgian franc. By 1990, the difference between the average Schroder rate and the market rate had escalated to 12.96%. Complaint, at ¶ 19. As a result, CSAV alleges common law fraud, breach of contract, breach of fiduciary duty and violations of civil RICO, 18 U.S.C. § 1962.

## II. Standards for Summary Judgment

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). In testing whether the movant has met this burden, the Court must resolve all ambiguities against the movant. *Lopez v. S.B. Thomas, Inc.,* 831 F.2d 1184, 1187 (2d Cir.1987) (citing *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Adickes v. S.H. Kress and Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). The movant may discharge this burden by demonstrating to the Court that there is an absence of evidence to support the non-moving party's case on which that party

---

**4.** On June 14, 1990, Barry Geis ("Geis"), Chilean Line's chief financial officer since 1979, and Patricio Grez ("Grez"), recently promoted from Manager of CSAV's Finance Division in Chile to President of Chilean Line, met with Schroder officials to complain about Schroder's foreign currency exchange rates. Grez Tr., at 240–246; Geis Tr., at 307–09, 313–14.

**5.** Discovery in this case, prior to disposition of this motion, has been limited to transactions involving the Belgian franc.

would have the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).[6] The non-moving party then has the burden of coming forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The non-movant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Speculation, conclusory allegations and mere denials are not enough to raise genuine issues of fact. To avoid summary judgment, enough evidence must favor the non-moving party's case such that a jury could return a verdict in its favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (interpreting the "genuineness" requirement).

## III. CSAV's Claims [7]

### A. *Common Law Fraud*

The five elements of an action for common law fraud are "representation of material fact, falsity of that representation, scienter, reliance and damages." *Mallis v. Bankers Trust Co.*, 615 F.2d 68, 80 (2d Cir.1980), *cert. denied*, 449 U.S. 1123, 101 S.Ct. 938, 67 L.Ed.2d 109 (1981); *accord Jo Ann Homes at Bellmore, Inc. v. Dworetz*, 25 N.Y.2d 112, 119, 302 N.Y.S.2d 799, 803, 250 N.E.2d 214, 217 (1969). CSAV contends that it has established these elements, and that Schroder's motion for summary judgment on its fraud claim must therefore be denied. The Court disagrees.

### 1. CSAV's Contentions

CSAV's basic contention is that it was fraudulent for Schroder to promise that it would give CSAV favorable exchange rates and then charge rates significantly above the prevailing market rate.

### a. *Elements of Common Law Fraud*

#### (i) Schroder's Representations

Between 1979 and 1981, Geis had a series of "good will" meetings with Schroder's foreign exchange traders in New York. According to CSAV, Geis was told by Schroder's traders that "CSAV was considered a preferred client within the bank ... and that CSAV was given preferential treatment within the [foreign exchange] department." Geis Tr., at 48. The nature of the preferential treatment was that CSAV's foreign currency remittances "[were] given rates normally credited to larger amounts," Geis Tr., at 48, and the rate applied to CSAV's conversions was the "million dollar rate." *Id.* at 65–66. Geis was also told that the "million dollar rate" was Schroder's best rate for corporate accounts, and was at or near the interbank rate. *Id.* at 48, 65–66, 78, 93, 310–11, 378.

Based on this testimony and the affidavit of Claude Tygier, Schroder's chief foreign exchange trader from June 1979 through January 1984, CSAV asserts that Schroder made the following representations to CSAV: (a) that CSAV was a preferred customer, Geis Tr., at 45–48, 83–84; (b) that the manner in which Schroder converted foreign currencies for CSAV was "unique"

---

**6.** The moving party may rely on the evidence in the record to point out the absence of genuine issues of material fact. *Celotex, supra*, 477 U.S. at 323, 106 S.Ct. at 2552. The moving party does not have the burden of providing evidence to negate the non-moving party's claims. *Id.* As the Supreme Court recently noted, "whether the moving party accompanies its summary judgment motion with affidavits, the motion may, and should, be granted so long as whatever is before the court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.*

**7.** In its Memorandum of Law in support of its Motion for Summary Judgment ("Def.Mem."), Schroder contends that portions of each of

CSAV's claims are barred by the applicable statute of limitations. Def.Mem., at 39–41. Although courts generally address statute of limitations issues before substantive matters, in this case the Court will first examine the more substantive issues. The Court has taken this approach because Schroder's statute of limitations arguments apply only to portions of each of CSAV's claims, and thus even if Schroder's contentions are correct, it will still be necessary to address the substantive challenges raised by Schroder. Further, the Court has determined that it is not possible to address the statute of limitations issues without first analyzing the substantive claims themselves.

and, unlike a trading relationship, was actually a currency management service, Affidavit of Claude Tygier ("Tygier Aff."), sworn to on October 31, 1991, at ¶¶ 3, 7; Hamway Tr., at 175–78; Exhibit "I" to DiNatale Affidavit ("DiNatale Aff."), sworn to on November 11, 1991; (c) that Schroder was obligated to provide CSAV with rates commensurate with CSAV's status as a preferred customer, Tygier Aff. at ¶¶ 3e, 4, 5; and (d) that the rates Schroder would apply to CSAV's conversions—variously referred to as the "million dollar rate," "spot rate," "preferred customer rate," and "interbank rate"—were at least as good as the best rates Schroder gave its corporate customers and at or near the rates banks applied in transactions among themselves. Geis Tr., at 48, 65–66, 78, 93, 310–11, 378.

#### (ii) CSAV's Reliance

CSAV also contends that it relied upon Schroder's representations that CSAV would receive favorable exchange rates. CSAV argues that an internal Schroder memorandum specifically describes CSAV's reliance upon Schroder's representations. This memorandum states:

> Barry [Geis] also informs that all CSAV agents are instructed to remit to Schroder, New York and we have converted such payments for CSAV at the spot rate
>
> . . .

Exhibit "H" to DiNatale Aff. According to CSAV, this memorandum establishes that CSAV expected Schroder to convert foreign currencies for CSAV at the "spot price," which was equivalent to the "million dollar rate," at or near the interbank rate and Schroder's best rate for corporate accounts. Geis Tr., at 48, 93, 310–11, 378. In addition, CSAV contends that reliance is established as it continued to remit its European currencies exclusively to Schroder for conversion.

#### (iii) Scienter

CSAV contends that the scienter requirement is established because Schroder knew

that CSAV was relying upon Schroder to convert CSAV's currencies at or near the interbank rate, and not treat CSAV as a trading partner, see, e.g., Exhibit "H" to DiNatale Aff. ("Barry [Geis] informs me that ... we have converted such payments for CSAV at the spot rate"); Suttie Tr., at 96 ("you know we never trade"), and despite this knowledge, Schroder converted CSAV's currency at grossly unfavorable rates.[8]

#### b. *The Confirmations Were Part of the Scheme to Defraud*

CSAV also alleges that as part of its scheme to defraud, Schroder failed to advise CSAV, and omitted from its written confirmations, the prevailing market rate of exchange, the actual rate at which Schroder executed each trade with its correspondent banks, the amount or percentage of Schroder's margin or profit, the extent to which Schroder's rate of exchange exceeded the market rate, and any administrative and other expenses Schroder incurred on CSAV's behalf. Complaint, at ¶ 35.

Further, in response to Schroder's argument that there is no fraud because each confirmation sent to CSAV truthfully and accurately reflected the rate that had been applied to each conversion, CSAV argues that it is irrelevant that the confirmations reflected the actual numerical rates at which the conversions were accomplished, because Schroder knew that CSAV expected that the rates disclosed on the confirmations were what Schroder had represented the rates would be—i.e., at least as good as Schroder's best corporate account rates and at or near the interbank rates.

#### 2. Discussion

The Court disagrees with CSAV's contentions and finds, as a matter of law, that Schroder is entitled to summary judgment on CSAV's common law fraud claim.

---

**8.** For purposes of this motion, there is no dispute that Schroder, in converting currencies on behalf of CSAV, did not apply rates at or near the interbank rates. With respect to the Belgian franc, the only currency subject to discovery

prior to this motion, the rate of conversion increased steadily from an average of 1.35% above the interbank rate in 1984 to an average of 12.96% above the rate in 1990. Complaint, at ¶ 19.

### a. *Absence of Justifiable Reliance*

Under New York law, a plaintiff must establish that his reliance was justifiable, both in the sense that the party claiming to have been defrauded was justified in believing the representation and that he was justified in acting upon it. 2 *New York Pattern Jury Instructions*, PJI 3:20, commentary, at 95 (Supp.1991). Thus, the question becomes under what circumstances is a plaintiff's reliance justified. It is well established that when matters are peculiarly within the knowledge of the defendant, a plaintiff may rely on defendant's representations without prosecuting an investigation, as he has no independent means of ascertaining the truth. *Mallis v. Bankers Trust Co.*, 615 F.2d 68, 80 (2d Cir.1980), *cert. denied*, 449 U.S. 1123, 101 S.Ct. 938, 67 L.Ed.2d 109 (1981); *see e.g. Tahini Investments, Ltd. v. Bobrowsky*, 99 A.D.2d 489, 490, 470 N.Y.S.2d 431, 433 (2d Dept.1984) (defendant did not disclose that drums of industrial waste had been buried underground at 93 acre farm; no need for plaintiff to investigate if drums were peculiarly within the seller's knowledge); *Todd v. Pearl Woods, Inc.*, 20 A.D.2d 911, 248 N.Y.S.2d 975 (2d Dept.1964), *aff'd*, 15 N.Y.2d 817, 257 N.Y.S.2d 937, 205 N.E.2d 861 (1965) (failure to check defendant's representations against public records no bar to fraud claim). By contrast, when misrepresentations concern matters that are not peculiarly within the defendant's knowledge, as in this case, New York courts have rejected claims of justifiable reliance because:

> [if plaintiff] has the means of knowing, by the exercise of ordinary intelligence, the truth, or the real quality of the subject of the representation, he must make use of those means, or he will not be heard to complain that he was induced to enter into the transaction by misrepresentations (Citations Omitted).

*Mallis v. Bankers Trust Co.*, 615 F.2d at 80–81 (citing *Schumaker v. Mather*, 133 N.Y. 590, 598, 30 N.E. 755, 757 (1892)); *see also Heineman v. S & S Machinery Corp.*, 750 F.Supp. 1179, 1186–87 (E.D.N.Y.1990) (fraud "cannot be based on a failure to make simple inquiries" where the information allegedly not disclosed could have been easily obtained through "duly diligent inquiry," or by the exercise of "ordinary intelligence").

In an effort to explain the above standard, the Second Circuit stated in *Mallis* that reliance on misrepresentations is not justified if "plaintiff was placed on guard or practically faced with the facts." *Id.* at 81 (citing *Danann Realty Corp. v. Harris*, 5 N.Y.2d 317, 184 N.Y.S.2d 599, 157 N.E.2d 597 (1959) (buyer may not rely on misrepresentations in face of contract clause eschewing such reliance); *Sylvester v. Bernstein*, 283 A.D. 333, 127 N.Y.S.2d 746, aff'd 307 N.Y. 778, 121 N.E.2d 616 (1954) (landlord may not rely on tenants' representation that apartment would not be used for residential purposes)). However, under New York law, a plaintiff will be deemed to have been "practically faced with the facts" if he has access to the critical information. Both the Second Circuit and New York state courts have recognized the principle that access [to material information] "bars claims of reliance on misrepresentations." *Grumman Allied Industries, Inc. v. Rohr Industries, Inc.*, 748 F.2d 729, 737, n. 13 (2d Cir.1984) (where sophisticated businessmen engaged in major transactions enjoy access to critical information but fail to take advantage of that access, New York courts are particularly disinclined to entertain claims of justifiable reliance).

In this case, there is no basis to dispute that CSAV had access to the critical information underlying its fraud claim and, had it exercised ordinary intelligence or made simple inquiries, CSAV would have been able to discover the alleged misrepresentations. Thus, CSAV cannot establish justifiable reliance.

CSAV's claim is based upon the difference between the rate charged by Schroder and the interbank rate, the rate allegedly promised by Schroder. At all relevant times, CSAV had access to both relevant rates. The rate charged by Schroder was

confirmed in writing to CSAV,[9] Complaint, at ¶ 13; Grez Tr., at 27; Geis Tr., at 126–27; Seeley Tr., at 142–43, and the interbank foreign exchange rates were available in daily newspapers. Grez Tr., at 33–34, 71–72, 120–21, 203; Geis Tr., at 196–97, 280–81; Seeley Tr., at 27, 98. Further, it is undisputed that Chilean Line subscribed to both *The Wall Street Journal* and the *New York Times*. Grez Tr., at 33–34. Moreover, it has been established that during the relevant period, Geis, the agent of CSAV in charge of dealing with Schroder, read the *New York Times* and *The Wall Street Journal* and Grez read *El Mercurio*, all of which publish currency exchange rate tables. Geis Tr., at 279–281; Grez Tr., at 72. In fact, Geis testified that he has read *The Wall Street Journal* on a daily basis for more than fifteen years and has read the foreign exchange tables in *The Wall Street Journal* on a regular basis since at least 1979. Geis Tr., at 278–80. Thus, as even CSAV's witnesses concede, CSAV could at any time have compared Schroder's rates to the interbank rate published in the newspaper. Grez Tr., at 71–72, 203; Geis Tr., at 196–97; Seeley Tr., at 27; Exhibit "AO" to Def. Appendix.[10]

In addition to consulting newspapers, CSAV could have discovered the alleged misrepresentations by calling other banks and obtaining quotations, as it did in June of 1990. Grez testified that:

> [T]he foreign exchange market is the biggest market in the world; huge quantities are transacted. It's the most—if there is a perfect market, that's the foreign exchange market. It's very trans-

parent. Rates are available to whoever wants to look at them on the screens.... Grez Tr., at 56. Moreover, Geis' testimony indicates that CSAV was quite familiar with obtaining foreign exchange quotations from other institutions. Geis testified that after he was employed as Chilean Line's top financial officer in 1979, for two or three weeks "whenever we got an advice that Schroder had converted a currency for us, I matched the rate against a quote that I would get from one or more other banks." Geis Tr., at 49. In addition, in 1988 and 1989 when CSAV sought to purchase currency futures in the Japanese yen, Geis solicited quotes from Chase and First Maryland and purchased from whichever bank provided the better rate. Geis Tr., at 113, 179, 182–83, 185–86, 194; Exhibit "AC" to Def. Appendix. Finally, it is clear that CSAV obtained quotes from other banks in June of 1990. In fact, it was the superiority of these other quotes that led CSAV to discontinue its relationship with Schroder.

Further, CSAV's reliance is unjustified because CSAV officials recognized that they were responsible for checking the prices on foreign exchange transactions to make sure they were acceptable. Geis testified that CSAV was ultimately responsible for monitoring the prices at which foreign exchange transactions with Schroder were undertaken. Geis Tr., at 125. Grez testified that as manager of the Finance Division he was directly responsible for overseeing CSAV's foreign exchange activities, and it was his duty to make sure that CSAV got a fair market price for its foreign exchange activities. Grez Tr., at

---

**9.** Schroder confirmed each foreign exchange transaction in writing to both CSAV in Chile and Chilean Line in New York. The confirmations included the amount of foreign currency, the exchange rate, the U.S. dollar amount and the value date. *See* Exhibit "D" to Appendix of Pleadings and Exhibits submitted in Connection with Defendant's Motion for Summary Judgment ("Def. Appendix").

**10.** CSAV contends that Schroder was committed to apply not the "interbank rate," but, rather, a rate at or near the interbank rate that was at least as good as the rate Schroder gave other corporate accounts. Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for

Summary Judgment (Pl.Mem.), at 23. And since those rates were not public information and were not disclosed by Schroder to CSAV, CSAV claims that it is irrelevant that CSAV's employees read newspapers which included foreign exchange tables. The Court disagrees.

CSAV's entire complaint is based on Schroder having charged rates above the published interbank or market rate. Complaint, at ¶¶ 18, 19, 20. Further, in calculating its alleged damages CSAV used the rate charged by Schroder and the published interbank rate. Complaint, at ¶ 21, 22, 23, 24. Thus, CSAV cannot now claim that it had no knowledge of the rate Schroder was committed to apply.

18–19. Grez also testified that "if [Geis] found out that we had not received proper market rates, he would force the bank or ask the bank—I don't recall, of course, the exact words—to refund the company the proper difference." Grez Tr., at 54, 60.

Since CSAV did not compare Schroder's rates with the published interbank rate, did not ask other banks for quotations, and made no effort to inquire as to the underlying facts of its claim prior to June 1990, despite the availability of such information, the Court finds, as a matter of law, that CSAV's reliance on Schroder's alleged misrepresentations was unreasonable.

### b. *Absence of scienter or fraudulent intent*

■ CSAV's fraud claim is premised on statements made to Geis by Schroder foreign exchange traders during a series of "goodwill" meetings between 1979 and 1981. CSAV claims that during these meetings Geis was told that "CSAV was considered a preferred client within the bank ... and that CSAV was given preferential treatment within the [foreign] exchange department." Pl.Mem., at 11; Geis Tr., at 48. Geis was also told that "the rate applied to CSAV's conversions was the million dollar rate." Pl.Mem., at 11; Geis Tr., at 65–66. Construing these statements as promises or representations by Schroder that CSAV was getting Schroder's best rates, CSAV alleges that "[p]romising a favorable rate and charging another is a clear cut fraud." Pl.Mem., at 17. The Court disagrees.

First, the evidence establishes that from 1979–1984 Schroder did not promise favorable rates and charge other rates. In fact, the record indicates that for many years Schroder applied favorable rates. Geis testified that when he started working at Chilean Line in 1979 he checked the foreign exchange rates at various other banks and found that Schroder's rates were competitive. Geis Tr., at 66, 236. In addition, the fact that CSAV's fraud claim seeks damages for excessive rates charged by Schroder between January 1, 1984 and June 1990, indicates that Schroder applied favorable rates prior to January of 1984.

Second, there is no evidence that these promises by Schroder were to last indefinitely. *See* Geis Tr., at 50–51.[11] But even if the statements made to Geis between 1979 and 1981 are construed as promises by Schroder to apply favorable rates indefinitely, Schroder's failure to continue applying these preferable rates does not constitute fraud under New York law as the record contains no evidence that Schroder intended not to perform its alleged promises at the time they were made. It is well settled that "fraudulent intent not to perform a promise cannot be inferred merely from the fact of nonperformance." *Deligiannis v. Pepsico, Inc.*, 757 F.Supp. 241, 254 (S.D.N.Y.1991) (citing *Brown v. Lockwood*, 76 A.D.2d 721, 733, 432 N.Y.S.2d 186, 195 (2d Dept.1980)). Indeed, this Court has held that "nonperformance of a promise alone does not support an inference that it was fraudulent when uttered." *Zola v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, CCH Fed.Secur.L.Rep. ¶ 93, 159 at 95, 721–22, 1987 WL 7742 (S.D.N.Y.1987). In order to properly allege a fraud claim, a defrauded party "must allege specific facts showing that the promisor intended not to honor his obligations at the time the promise was made." *National Westminster Bank v. Ross*, 130 B.R. 656, 664 (S.D.N.Y. 1991) (citing *Songbird Jet Ltd., Inc. v. Amax Inc.*, 581 F.Supp. 912 (S.D.N.Y.1984), *aff'd*, 812 F.2d 713 (2d Cir.1987)).

Since CSAV has offered no evidence that Schroder intended not to perform the alleged promise to apply favorable rates at the time the promise was made, and the record establishes that Schroder applied preferable rates from 1979–1984, the Court

11. Aside from the longstanding relationship between CSAV and Schroder, CSAV has produced no evidence which indicates that the statements made to Geis were anything more than promises to give favorable rates between 1979 and 1981, when the statements were made. Although Geis testified that he believed the preferable rates would apply "ad infinitum," he could not recall anyone from Schroder making such a statement. In fact, he testified that it "was merely the impression I had." Geis Tr., at 50–51.

finds, as a matter of law, that CSAV has failed to prove fraudulent intent.

### c. *The Confirmation Slips Were Not Part of A Scheme to Defraud*

■ Since the Court has found that CSAV alleges no actionable fraud, the confirmations sent to CSAV by Schroder *a fortiori* cannot be part of any scheme to defraud. But, even if the Court had not made the above two findings, CSAV's theory that each confirmation slip was part of a scheme to defraud is untenable.

In the complaint, CSAV alleges that:

As part of its scheme to defraud CSAV, Schroder wilfully and intentionally failed to advise CSAV and omitted from its written confirmations the prevailing market rate of exchange, the actual rate at which Schroder executed each trade with its correspondent banks, the amount or percentage of Schroder's margin or profit, the extent to which Schroder's rate of exchange exceeded the market rate, and any administrative and other expenses Schroder incurred on CSAV's behalf.

Complaint, at ¶ 35. For the following reasons, however, the Court finds that the confirmations were not a part of a scheme to defraud. First, there is no dispute that the confirmations truthfully and accurately stated the terms of the foreign exchange contracts, which is all they were required to do. *See* Pl.Mem., at 18. CSAV has presented no evidence that the confirmations were designed to include the allegedly omitted information. In fact, the evidence indicates that the purpose of the confirmations was to confirm particular transactions between CSAV and Schroder.

Second, there is no basis for CSAV's allegation that Schroder omitted "the actual rate at which Schroder executed each trade with its correspondent banks." Every confirmation slip contained the rate of exchange, *see, e.g.,* Exhibit "D" to Def. Appendix, at 1, and that rate was the actual rate at which each currency exchange was executed with CSAV, the only other principal in each transaction. *See* Grez Tr., at 49–51; Seeley Tr., at 36.

Third, if CSAV had exercised ordinary intelligence or made simple inquiries as required by New York law, it would have discovered the prevailing market rate of exchange and uncovered the facts underlying the alleged scheme to defraud. Moreover, CSAV has presented no evidence that Schroder was required to disclose the prevailing market rate on the confirmations. In fact, the Second Circuit has stated that "there is no duty to disclose information to one who reasonably should already be aware of it," *Seibert v. Sperry Rand Corp.*, 586 F.2d 949, 952 (2d Cir.1978), and has rejected fraud claims based on the omission or nondisclosure of market rates. *Hafner v. Forest Laboratories, Inc.*, 345 F.2d 167, 168 (2d Cir.1965) (plaintiff was not "misled" by defendant's non-disclosure of market price information because "current price information on [defendant's] stock was available to the public in the National Daily Quotations Sheets"); *Klamberg v. Roth*, 473 F.Supp. 544, 552 (S.D.N.Y.1979) (no duty to disclose existed because "all of the factual information was readily available to plaintiff, especially since, as the complaint itself concedes, [the stock in question] was at all material times traded on the New York Stock Exchange").

Fourth, the "extent to which Schroder's rate of exchange exceeded the market rate" is merely a subtraction problem. Because CSAV knew the Schroder rate and the interbank or market rate was readily available, CSAV only had to subtract one from the other to find the allegedly omitted information.

Fifth, the remaining alleged omissions cited by CSAV are irrelevant and immaterial, and there is no evidence that Schroder had a duty to disclose such information.

Finally, even if there was a duty to disclose, the Court would not find that the confirmations were part of a fraudulent scheme because it was unreasonable for CSAV to rely on the confirmations as representing that Schroder was applying rates at or near the interbank rate when CSAV itself had access to the interbank rate in the daily newspapers.

In an effort to revitalize its theory that the confirmations were part of a scheme to defraud, CSAV changes tactics. In opposition to the motion, CSAV argues that the confirmations were part of the scheme to defraud because "Schroder knew CSAV expected and understood that the rates disclosed on the confirmations were what Schroder represented the rates would be— i.e., at least as good as Schroder's best corporate account rates and at or near the interbank rates." Pl.Mem., at 18–22. In other words, although the confirmations were themselves accurate, they were part of a fraudulent scheme because they "represented that the rates applied were at or near the interbank rate when that was not the case." Pl.Mem., at 22.

Essentially, CSAV is claiming two things. First, that Schroder was required to disclose additional information so CSAV would know that the rates applied were not "at or near the interbank rate." As discussed above, this claim is without merit. CSAV had access to all material information, and there has been no evidence presented that Schroder had a duty to disclose additional information.

■■■ Second, CSAV is claiming that unless the slips disclosed that Schroder was no longer applying the favorable rates promised, or that Schroder was no longer in compliance with the alleged promises made to CSAV between 1979 and 1981, the confirmation slips were part of the fraudulent scheme. However, failing to disclose a breach of promise does not transform a contract action into one for fraud. *Rodgers v. Roulette Records, Inc.*, 677 F.Supp. 731, 738 (S.D.N.Y.1988) (citing *Brignoli v. Balch Hardy and Scheinman, Inc.*, 645 F.Supp. 1201, 1207 (S.D.N.Y.1986) (a claim that defendant "intentionally and falsely represented that it was abiding by the alleged contract" was insufficient to support a fraud claim)); *Robehr Films, Inc. v. American Airlines, Inc.*, No. 85 Civ. 1072

(RPP), 1989 WL 111079, *4 (S.D.N.Y. Sept. 19, 1989) ("it is simply not a tort to fail to advise that the contract has been, or is being, breached"), *aff'd* 902 F.2d 1556 (2d Cir.1990). Thus, the Court finds that the confirmation slips were not part of the scheme to defraud.

Accordingly, the Court concludes, as a matter of law, that Schroder is entitled to summary judgment on CSAV's common law fraud claim.

**B. RICO**

■■■ CSAV also alleges that Schroder violated § 1962(c) of the Racketeer Influenced and Corrupt Organizations Act, which provides that:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c). The offenses which underlie "racketeering activity" are the predicate acts necessary for a RICO violation. They are defined in 18 U.S.C. § 1961(1) as acts "indictable" or "punishable" under various federal criminal statutes, and acts "chargeable" under certain state criminal laws. *See Equitable Life Assurance Society v. Alexander Grant & Co.*, 627 F.Supp. 1023, 1027 (S.D.N.Y.1985). These include murder, kidnapping, arson, robbery, bribery, extortion, dealing in narcotics, securities fraud, mail fraud and wire fraud. In this case, the predicate acts alleged in the complaint are violations of the mail fraud statute, 18 U.S.C. § 1341, and the wire fraud statute, 18 U.S.C. § 1343. According to CSAV, between 1984 and 1990, Schroder engaged in hundreds of separately indictable acts of federal mail and wire fraud.[12]

12. CSAV also appears to allege, although not in its complaint, that non-disclosure by a fiduciary may constitute the predicate for a RICO violation. Pl.Mem., at 63–64. According to CSAV, "the concealment by a fiduciary of material information which he is under a duty to disclose to another under circumstances where the non-disclosure could or does result in harm to another is a violation of the [mail fraud] statute." *United States v. Bronston*, 658 F.2d 920,

 The offenses of both mail and wire fraud require proof of the same two elements: [13] (1) that defendant participated in a scheme to defraud; and (2) knowingly used the mails (or wires) to further the scheme. *United States v. Rodolitz*, 786 F.2d 77, 80 (2d Cir.1986), *cert. denied*, 479 U.S. 826, 107 S.Ct. 102, 93 L.Ed.2d 52 (1986) (citations omitted). Additionally, "proof of a fraudulent scheme requires evidence showing a specific intent to defraud," *id.* (quoting *United States v. Gelb*, 700 F.2d 875, 879 (2d Cir.1983), *cert. denied*, 464 U.S. 853, 104 S.Ct. 167, 78 L.Ed.2d 152 (1983)), which can be shown by proof that the scheme was reasonably calculated to deceive persons of ordinary prudence and comprehension. *Virden v. Graphics One*, 623 F.Supp. 1417, 1422 (C.D.Cal.1985).

 Before the Court can determine whether CSAV can establish these elements, it must first determine whether a plaintiff can ever satisfy the requirements of mail or wire fraud when its common law fraud claim has been dismissed. The Second Circuit has not yet considered whether the elements of common law or state statutory fraud must be satisfied to establish the predicate act of mail or wire fraud for civil RICO liability, and decisions within this district have been inconsistent. Some courts have held that the plaintiff's inability to plead common law fraud does not preclude a RICO claim based upon a scheme to defraud under the mail fraud statute. *See e.g., Scharff v. Claridge Gardens, Inc.*, 1990 WL 186879, 1990 U.S. Dist. LEXIS 15776 (S.D.N.Y.1990); *Shaw v. Rolex Watch U.S.A., Inc.*, 726 F.Supp. 969, 972 (S.D.N.Y.1989); *GLM Corp. v. Klein*, 684 F.Supp. 1242, 1244–45 (S.D.N.Y.1988). However, other courts have dismissed RICO claims "based upon the predicate act of mail fraud where the complaint pleads a scheme to defraud under the mail fraud

statute that does not state a claim for common law fraud." *Scharff*, 1990 WL 186879 at *3, 1990 U.S. Dist. LEXIS at *8 (citing *Morin v. Trupin*, 711 F.Supp. 97, 105 (S.D.N.Y.1989); *Long Island Lighting Co. v. Transamerica Delaval, Inc.*, 646 F.Supp. 1442, 1453 (S.D.N.Y.1986); *River Plate Reinsurance Co. v. Jay–Mar Group, Ltd.*, 588 F.Supp. 23, 26–27 (S.D.N.Y.1984)).

Although there is no requirement in the text of the mail fraud statute that common law or state statutory fraud controls the sufficiency of a scheme to defraud under the mail fraud statute, and it is indeed well established that the reach of the mail fraud statute is not limited to common law or state statutory definitions of fraud, *see Scharff*, 1990 WL 186879 at *3, 1990 U.S.Dist. LEXIS at *8 (citing numerous cases), the Court holds that the better view is that where the fraudulent scheme is premised upon an inadequate fraud claim, allegations of mail and wire fraud must generally also fail. *See Morin*, 711 F.Supp. at 105.

 Thus, CSAV's predicate act claim must fail, for, as set forth above, CSAV fails to adduce evidence that Schroder engaged in any "fraud" or "fraudulent scheme." *Id.* "Because the common law fraud [claim] is dismissed, there are no valid allegations of 'fraud' to underpin the ... RICO allegations and those claims must be dismissed as well." *Id.*

 However, even if the Court accepted the view that dismissal of the common law fraud claim does not preclude a RICO claim based upon a scheme to defraud under the mail and wire fraud statutes, the RICO claim in this case would still be dismissed as a matter of law because CSAV cannot establish the elements of either mail fraud or wire fraud. Proof of a fraudulent scheme requires evidence showing a specific intent to defraud, and, as discussed

926 (2d Cir.1981), *cert. denied*, 456 U.S. 915, 102 S.Ct. 1769, 72 L.Ed.2d 174 (1982). Because the Court finds that no fiduciary relationship existed between the parties, it is unnecessary to address CSAV's contentions. See *infra* 424–27.

**13.** *See United States v. Von Barta*, 635 F.2d 999, 1005 n. 11 (2d Cir.1980) (courts have uniformly

given the language of both statutes the same construction), *cert. denied*, 450 U.S. 998, 101 S.Ct. 1703, 68 L.Ed.2d 199 (1981), overruling on other grounds recognized by, 841 F.2d 450 (2d Cir.1988).

above, CSAV cannot prove that Schroder had a specific intent to defraud. In this case, moreover, the alleged fraudulent omissions in the confirmation slips and fraudulent misrepresentations as to what rates Schroder would charge, were not reasonably calculated to deceive persons of "ordinary prudence and comprehension." Since Schroder knew that CSAV had access to both the rates charged by Schroder and the prevailing market rate, and since it is unreasonable to assume that Schroder was unaware of the facility with which an ordinary person might calculate that Schroder's rates were above the interbank rate, the Court finds, as a matter of law, that there is no proof of a fraudulent scheme reasonably calculated to deceive persons of ordinary prudence and comprehension.

For the aforementioned reasons, Schroder's motion for summary judgment as to CSAV's RICO claim is granted.

## C. *Breach of Fiduciary Duty Claim*

■ CSAV contends that the evidence establishes a fiduciary relationship, and that Schroder breached its fiduciary duty by charging CSAV rates in excess of the alleged promised rates. As support for its claim that a fiduciary relationship existed between Schroder and CSAV, CSAV points to their longstanding relationship of fifty years, and Schroder having deemed "CSAV and its subsidiaries [one] our oldest and most respected client relationships," and indeed, one of Schroder's leading clients in Latin America. Seeley Tr., at 208; *see, e.g.,* Exhibit "O" to DiNatale Aff., at S00213; Exhibit "P" to DiNatale Aff., at S00187.

As further support for its claim, CSAV alleges that the relationship between Schroder and CSAV in connection with currency conversions was special and unique. Schroder's former President and former C.E.O. Hamway said the relationship was an "international cash management service" not provided to others. Hamway Tr., at 175–78. In addition, Tygier states that, unlike currency transactions with its other corporate accounts, Schroder did not trade with CSAV. Tygier Aff., at ¶ 3. Instead,

"Schroder acted as a fiduciary and managed CSAV's foreign currency exchange activity for CSAV, and automatically converted or exchanged foreign currency on CSAV's behalf." Tygier Aff., at ¶ 3. Tygier also states that "Schroder acted in the capacity of a manager and fiduciary of CSAV's currency conversions in that CSAV and Schroder were in a unique relationship of trust." Tygier Aff., at ¶ 7.

Finally, CSAV claims that every CSAV witness testified that, by reason of the longstanding relationship and the manner in which foreign exchange business had been conducted, CSAV reposed trust and confidence in Schroder and relied upon Schroder to give CSAV the best rates. Geis Tr., at 383–85, 411–12; Grez Tr., at 47–49, 202; Suttie Tr., at 98–99; Seeley Tr., at 87–88.

Contrary to CSAV's assertions and Tygier's unjustified, conclusory statements about the existence of a fiduciary relationship, the Court finds, as a matter of law, that no fiduciary relationship existed between CSAV and Schroder; therefore there could be no breach of fiduciary duty.

Although "the exact limits of the term 'fiduciary relation' are impossible of statement," G. Bogert, *The Law of Trusts and Trustees,* § 481 (2d Ed.Rev.1984), broadly speaking,

> [a] fiduciary relationship is one founded on trust or confidence reposed by one person in the integrity and fidelity of another. The term is a very broad one. It is said that the relation exists, and that relief is granted in all cases in which influence has been acquired and abused, in which confidence has been reposed and betrayed. The origin of the confidence and the source of the influence are immaterial. The rule embraces both technical fiduciary relations and those informal relations which exist whenever one man trusts in and relies upon another. Out of such a relation, the laws raise the rule that neither party may exert influence or pressure upon the other, take selfish advantage of his trust or deal with the subject matter of the trust in such a way as to benefit himself or prejudice the

other except in the exercise of utmost good faith.... A fiduciary relation exists when confidence is reposed on one side and there is resulting superiority and influence on the other.

*Mobil Oil Corporation v. Rubenfeld*, 72 Misc.2d 392, 339 N.Y.S.2d 623, 632 (1972), *rev'd on other grounds*, 48 A.D.2d 428, 370 N.Y.S.2d 943 (1975); *accord, CBS, Inc. v. Ahern*, 108 F.R.D. 14 (S.D.N.Y.1985) (citing *United States v. Reed*, 601 F.Supp. 685, 707 (S.D.N.Y.1985); *Penato v. George*, 52 A.D.2d 939, 942, 383 N.Y.S.2d 900, 904–05 (2d Dept.1976), *appeal dismissed*, 42 N.Y.2d 908, 397 N.Y.S.2d 1004, 366 N.E.2d 1358 (1977)).

New York law is also quite clear, however, that "a conventional business relationship, without more, does not become a fiduciary relationship by mere allegation." *Oursler v. Women's Interart Center, Inc.*, 170 A.D.2d 407, 566 N.Y.S.2d 295 (1st Dept. 1991). Indeed, New York Courts have rejected the proposition that a fiduciary relationship can arise between parties to a business transaction, *National Westminster Bank, U.S.A. v. Ross*, 130 B.R. 656, 679 (S.D.N.Y.1991) (citing *Beneficial Commercial Corp. v. Murray Glick Datsun*, 601 F.Supp. 770, 772 (S.D.N.Y.1985)), and have concluded that "where parties deal at arms length in a commercial transaction, no relation of confidence or trust sufficient to find the existence of a fiduciary relationship will arise absent extraordinary circumstances." *National Westminster Bank*, 130 B.R. at 679 (citations omitted).

In this case, CSAV has failed to set forth evidence that the dealings between the parties were not arms-length, or that there were extraordinary circumstances that would give rise to a fiduciary relationship between the parties. In fact, the record conclusively establishes that CSAV and Schroder were parties with equivalent knowledge engaged in mutually beneficial, arms-length commercial transactions.

First, it is clear from the record that both Schroder and CSAV were sophisticated parties. CSAV and Chilean Line were run by individuals who very knowledgeable about the foreign currency market. They participated in complex foreign exchange "swap" operations with the Central Bank of Chile, Grez Tr., at 138; bought and sold Chilean debt in the market to profit from favorable dollar/peso exchange rates, Grez Tr., at 135; purchased yen futures from Chase, Geis Tr., at 111; engaged in dollar/yen "forward swaps" and "reconversions" with First Maryland, Geis Tr., at 113; were "absolutely" familiar with the process of "hedging" their foreign currency exposure, Grez Tr., at 126; and investigated sophisticated hedging devices such as the "Philadelphia option," Geis Tr., at 87–92.

Second, even if the Court finds that Schroder provided CSAV with an unique international cash management service, did not trade with CSAV as to each currency transaction, and promised to convert CSAV's currency at favorable rates, there is no evidence to support CSAV's allegation that this was a fiduciary relationship rather than an arms-length relationship. There is not a scintilla of evidence that the agreements between the parties were a result of unequal bargaining power or that Schroder acquired any influence over CSAV. In fact, the record establishes that this was a typical arms-length relationship designed to further the interests of the respective parties. In 1988, despite its longstanding ties to CSAV, Schroder told CSAV not to count on any credit from Schroder in the future, Grez Tr., at 192; Exhibit "46" to Def.App., and basically terminated its relationship with CSAV in all areas except foreign exchange because it was no longer profitable to maintain Latin American banking relationships. Moreover, although CSAV employees testified that they believed that they were not free to take their business elsewhere, Geis Tr., at 52, the abrupt termination of the relationship by CSAV in June 1990 indicates that this was an arms-length relationship that would continue until CSAV found that it could get superior rates elsewhere.

CSAV is correct when it argues that there are circumstances where a fiduciary relationship might be found to exist "based upon prior business dealings", *Apple Records, Inc. v. Capitol Records, Inc.*, 137

A.D.2d 50, 57, 529 N.Y.S.2d 279, 283 (1st Dep't 1988) (quoting *Penato v. George,* 52 A.D.2d 939, 942, 383 N.Y.S.2d 900, 904–05 (2d Dep't 1976), *appeal dismissed,* 42 N.Y.2d 908, 397 N.Y.S.2d 1004, 366 N.E.2d 1358 (1977)); *see also, Gittes v. Cook International,* 598 F.Supp. 717, 723 (S.D.N.Y. 1984), but CSAV has not established that such circumstances are present in this case. In *Apple Records,* the court's decision was based largely on the fact that plaintiffs' breach of fiduciary duty claim was inextricably linked to their cognizable claims for fraudulent concealment and fraudulent representation. *Apple Records,* 529 N.Y.S.2d at 283 ("it can be said that from such a long enduring relationship was borne a special relationship of trust and confidence, one which existed independent of the contractual duties, and one which plaintiffs argue was *betrayed by fraud* in *secretly* selling records claimed as scrapped and in diluting the market and exploiting the Beatles' popularity with excessive distribution of promotional copies to benefit other aspects of defendants' business.") (emphasis added). Even the format of the opinion indicates the link as plaintiffs' claims for fraud and breach of fiduciary duty are discussed by the court in an almost interchangeable manner. *Id.* 529 N.Y.S.2d at 283. It is also clear that the court upheld the breach of fiduciary duty cause of action in *Apple Records* because the plaintiffs alleged that defendants

breached their duty as bailees, a claim that is not asserted by CSAV in the case at hand. Thus, the court did not uphold the breach of fiduciary claim merely because the parties had a close 26 year business relationship.[14]

 Further, CSAV establishes no other basis for the existence of a fiduciary relationship. CSAV's allegations that the "nostro accounts" were "special accounts" which turn a debtor-creditor relationship into a fiduciary one, are unfounded, and its assertion that a fiduciary relationship was established because Schroder held CSAV's currencies in its "nostro accounts" for the benefit of CSAV, is without foundation.[15] In addition, CSAV evinces no evidence to establish that Schroder owed it fiduciary duties as either an agent or a trustee.

Thus, the Court concludes that CSAV's allegations that it reposed trust and confidence in Schroder and relied upon Schroder to give CSAV the best rates are merely an effort to avoid the repercussions of its lack of diligence in monitoring the rates at which conversions were made for over six years, and finds that Schroder is entitled to summary judgment on CSAV's breach of fiduciary duty claim.

## D. *Breach of Contract Claim*

### 1. CSAV's Contentions

CSAV claims that the evidence establishes that there was an oral agreement be-

---

**14.** *Gittes v. Cook International,* 598 F.Supp. at 723, is also distinct from the present case. In that case the court dealt with a situation involving corporate directors and the duties they owe to minority shareholders. Further, in that case the court determined that no fiduciary relationship arose from the business relationship. *Id.*

**15.** This case is markedly different from *SEC v. American Board of Trade, Inc.,* 654 F.Supp. 361 (S.D.N.Y.1987), *aff'd in part,* 830 F.2d 431 (2d Cir.1987), *cert. denied,* 485 U.S. 938, 108 S.Ct. 1118, 99 L.Ed.2d 278 (1988), where the court found a fiduciary relationship to exist based upon the defendant financial institution having arranged special "safekeeping accounts" for its T-bill customers. In *American Board of Trade,* the accounts were used to hold money for investment or in trust, whereas in this case the relationship was essentially one between buyer and seller. When Schroder received notification from the nostro bank, it purchased the

foreign currency from CSAV. Plaintiff's 3(g) statement, at ¶ 4(b)–(e); Defendant's 3(g) statement, at ¶ 23(b)–(e). The written confirmations sent to CSAV by Schroder, which explicitly stated that "WE HAVE BOUGHT" and "WE HAVE SOLD," are strong evidence that Schroder was indeed purchasing the foreign currency from CSAV. Exhibit "D" to Def.App.; *see also Banco Fonsecas & Burnay v. Prudential–Bache Securities, Inc.,* No. 87 Civ. 2308 (RO), 1990 WL 145150 at *2 (S.D.N.Y. Sept. 22, 1990), *aff'd,* 930 F.2d 910 (2d Cir.1991) (no fiduciary duty in transaction between purchaser and seller in government bond market).

Similarly, in *CBS, Inc. v. Ahern,* 108 F.R.D. 14, 25 (S.D.N.Y.1985), in which the court held that the allegations support the imposition of fiduciary duties, the money held in "special accounts" was to be "invested and reinvested from time to time" in securities selected by an investment advisor.

tween Schroder and CSAV regarding the management by Schroder of a conversion program for CSAV's currencies. CSAV contends that under this contract, it was obligated to remit all of its European currencies to Schroder's "nostro accounts," and Schroder was required to automatically convert those currencies to U.S. dollars and give CSAV a rate at or near the interbank rate. CSAV also contends that Schroder breached this agreement when it applied rates far in excess of the rates it agreed to apply.

## 2. Schroder's Contentions

Schroder contends that CSAV has produced no written contract which governs all of the parties' currency transactions, nor has any witness testified that such an agreement existed. *See* Grez Tr., at 34–35; Geis Tr., at 120; Suttie Tr., at 129, 135–36; Seeley Tr., at 29–30, 32; Wan Tr., at 300–01; Raphael Tr., at 60; Espinosa Tr., at 170–71; Hasselbach Tr., at 351. Thus, if any contract exists it must be an oral, unwritten agreement, as CSAV concedes. According to Schroder, however, CSAV's claim of the existence of an oral contract ignores the legal effect of the written confirmations that it regularly received. Because the specific terms of every foreign currency exchange, including the price term, were confirmed in writing to CSAV, Schroder argues that the parol evidence rule precludes CSAV from contradicting those written terms based on an alleged oral agreement. Moreover, Schroder claims that even if evidence of the alleged oral agreement was not barred by the parol evidence rule, the oral agreement is not an enforceable contract as a matter of law because "[it] is vapor." Def.Mem., at 18. None of CSAV's witnesses has any first-hand knowledge about the alleged oral agreement, its terms, the individuals who negotiated it, or when it was made. In addition, Schroder's witnesses have no knowledge of any oral agreement with CSAV respecting foreign exchange rates. Further, it is unenforceable because there is substantial confusion on the part of CSAV as to what the purported contract requires. On the strength of these argu-

ments, Schroder moves for summary judgment on CSAV's breach of contract claim.

For the reasons set forth below, the Court denies Schroder's motion for summary judgment on CSAV's breach of contract claim.

## 3. Discussion

### a. *Oral Agreement*

■ It is undisputed that there was no written contract which governed all of the foreign currency exchange transactions between the parties. However, the record establishes at least a genuine issue of material fact as to whether an oral agreement existed between Schroder and CSAV regarding the management by Schroder of a conversion program for CSAV's currencies.

In order to determine whether the parties entered into an oral agreement and the terms of such an agreement,

> it is necessary to look ... to the objective manifestations of the intent of the parties as gathered by their expressed words and deeds. In doing so disproportionate emphasis is not to be put on any single act, phrase or other expression, but, instead, on the totality of all of these, given the attendant circumstances, the situation of the parties, and the objectives they were striving to attain.

*Brown Brothers Electrical Contractors, Inc. v. Beam Construction Corp.*, 41 N.Y.2d 397, 399–400, 393 N.Y.S.2d 350, 352, 361 N.E.2d 999, 1001 (1977) (citations omitted). Further, "[it] is necessary that the totality of all the acts of the parties, their relationship and their objectives be considered in order to determine whether they entered into an oral agreement...." *P.J. Carlin Construction Co. v. Whiffen Electric Co., Inc.*, 66 A.D.2d 684, 411 N.Y.S.2d 27, 29 (1st Dept.1978).

In this case, the most compelling evidence for the existence of an oral agreement is the absence of other explanation for the relationship that developed between CSAV and Schroder. It is implausible that Schroder set up accounts in Europe to accept CSAV's European currencies, converted those currencies to U.S. dollars automat-

ically and without prior consultation with CSAV,[16] and CSAV agents remitted their European currencies exclusively to Schroder, without the existence of any overarching oral agreement between the parties.

Further evidence for the existence of an agreement is provided by both CSAV and Schroder witnesses. CSAV witnesses have testified that CSAV was obligated to remit all of its European currencies to Schroder for conversion, and that Schroder was obligated to give CSAV the best available rates. Specifically, Grez stated that Geis and three other CSAV executives each described the contract to him. Grez Tr., at 35–36. Each of the executives told Grez that CSAV was bound to remit its European currencies to Schroder, and Schroder would give "special consideration" to CSAV. In addition, Schroder would automatically convert the currencies into U.S. dollars at "the best possible exchange rate," to be determined by reference to a benchmark such as the "Reuters, Frankfurt or New York" interbank rates. Grez Tr., at 35–38, 41–45, 56, 248. Moreover, Suttie testified that she was told by a Schroder employee that "because of the monies we put through the account[,] [Schroder] would give us the best rate in the market." Suttie Tr., at 54–55. She also testified that CSAV had an "exclusive arrangement" whereby "all European currencies must go to Schroder," Suttie Tr., at 146, and because of the exclusivity, "Schroder was working on [CSAV's] behalf, [and] they were getting us an honest rate." *Id.* at 52.[17] Finally, Geis has testified that he was told that "for years—nobody knew when—all of CSAV's European currencies

were remitted to Schroder for conversion," Geis Tr., at 52, and that, in return, Schroder "converted [the currencies] and credited our account" and gave CSAV "preferential rates." Geis Tr., at 48–50.

Schroder witnesses have also provided testimony which tends to corroborate the existence of an oral agreement. Tygier has stated that Schroder "agreed to manage" and did manage the foreign currency activities for CSAV and was "committed" to give CSAV a rate at or near the interbank rate. Tygier Aff., at ¶¶ 2, 3, 5. Further, Schroder's former Chairman Hamway has testified that he believed Schroder was providing CSAV with an international cash management service that was not provided to any other Schroder client. Hamway Tr., at 175–177.

That none of CSAV witnesses has first-hand information about the oral agreement, its terms, the individuals who negotiated it or when it was made, does not warrant a finding that there was no oral agreement as a matter of law. It simply indicates that the alleged agreement was in existence prior to the involvement of the present witnesses.

Based on the circumstances of the relationship between Schroder and CSAV, and the testimony of both Schroder and CSAV witnesses, the Court finds that a jury could conclude that the parties were operating pursuant to an overarching agreement which provided that CSAV remit all of its European currencies to Schroder and Schroder convert these currencies at preferential rates.[18]

---

**16.** It is undisputed that there was no negotiation between Schroder and CSAV as to the rates to be applied to individual conversions of CSAV's currencies. *See* Def.Reply Mem., at 23 n. 14; Suttie Tr., at 96–99; Tygier Aff., at ¶ 3, 4, 7.

**17.** As Schroder points out, Suttie points to no specific basis for her belief that an oral agreement existed. She testified that she "just ... believed" an oral agreement existed because it was "just something that you feel [exists]." Suttie Tr., at 131–32. However, in light of the testimony of other CSAV employees and Schroder employees, and the lack of another explanation for the complex relationship that developed between the parties, the Court finds that CSAV

has raised a genuine issue of material fact as to the existence of an oral agreement.

**18.** Schroder argues that since the overarching agreement between CSAV and Schroder could only be deduced by looking at the "totality" of the parties' acts, their relationship, objectives, and "the manner in which the conversion program was operated," Pl.Mem., at 30–31, 34, it must be a contract "implied in fact." *Baltimore & Ohio R.R. Co. v. United States,* 261 U.S. 592, 597, 43 S.Ct. 425, 426, 67 L.Ed. 816 (1923) (an agreement implied in fact, "although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their

 Schroder argues, however, that even if the Court finds that an oral agreement exists, the inability of CSAV's witnesses to articulate the terms of the alleged oral understanding make the contract unenforceable. According to Schroder, CSAV's claimed entitlement to numerous and inconsistent rates makes the contract too vague and indefinite to be enforceable. As support for its position, Schroder cites the various rates claimed by CSAV employees at different times. At a meeting with Schroder officials in June 1990, Grez claimed the company was contractually entitled to "the best possible exchange rate." Grez Tr., at 246–48. A month later, CSAV claimed that the contract entitled it to "market rates no less favorable to us than those which would have been available to us from other first class international banks." Grez Tr., at 267; Exhibit "20" to Def.App. In a letter to the Court dated March 29, 1991, CSAV's counsel claimed that Schroder agreed to give CSAV a rate "equal to or better than that given to other customers." To further emphasize the confusion over what the contract purportedly required, Schroder highlights the inconsistencies in Geis' testimony. At varying times, Geis testified that CSAV's contractual rate could be higher than some market rates, Geis Tr., at 380; that CSAV had previously received the "million dollar rate" from Schroder, Geis Tr., at 65–66; that the "best possible rate" was the same as the "million dollar rate," Geis Tr., at 378; that the "best possible rate" equalled the interbank rate, Geis Tr., at 310–11; that the "million dollar rate" differed from the interbank rate, Geis Tr., 237–38; that CSAV was entitled to the "spot rate," Geis Tr., at 93; that he understood the "spot rate" to mean the "million dollar rate," Geis Tr., at 93; and that he now understands "spot rate" to refer to any exchange rate in a transaction maturing within two days. Geis Tr., at 101, 341.

It is well established that

[A] price term is not necessarily indefinite because the agreement fails to specify a dollar figure, or leaves fixing the amount for the future, or contains no computational formula. Where at the time of the agreement the parties have manifested their intent to be bound, a price term may be sufficiently definite if the amount can be determined objectively without the need for new expressions by the parties; a method for reducing uncertainty to certainty might, for example, be found within the agreement, or ascertained by reference to an extrinsic event, commercial practice, or trade usage.

*Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp.,* 74 N.Y.2d 475, 483, 548 N.Y.S.2d 920, 923, 548 N.E.2d 203, 206 (1989), *cert. denied,* —— U.S. ——, 111 S.Ct. 58, 112 L.Ed.2d 33 (1990). Thus, if the parties "specify a practicable method by which the price can be determined by the court without any new expressions by the parties themselves," the agreement is enforceable. *In re McManus,* 83 A.D.2d 553, 554, 440 N.Y.S.2d 954, 957 (2d Dept.1981), *aff'd,* 55 N.Y.2d 855, 447 N.Y.S.2d 708, 432 N.E.2d 601 (1982).

In this case, CSAV has submitted sufficient evidence so that the Court could determine the price without any new expressions by the parties. Although there have been slight variations in the testimony as to what rate the agreement requires, a jury could determine that CSAV was simply entitled to the best rate Schroder gave, and thus the price can be determined by reviewing the interbank rates, fair profit margins and rates Schroder and other banks gave to preferred customers

### b. *Parol Evidence Rule*

 As codified in Article 2 of New

---

tacit understanding"). Schroder argues, however, that in this case, it is improper for the Court to resort to implication. *See* Def.Reply Mem., at 29–31.

The Court need not consider whether Schroder's contentions are correct because there is not sufficient evidence to establish that the oral

agreement at issue must be a contract "implied in fact." Although it is clear that no express written contract exists, there is a genuine issue of material fact as to whether an express oral agreement regarding the conversion of currency existed between the parties. *See supra,* 417–18, 428–29.

York's Uniform Commercial Code,[19] the parol evidence rule states:

> **Final Written Expression: Parol or Extrinsic Evidence** Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement....

N.Y. U.C.C. § 2–202.[20]

■ Schroder's principal defense to CSAV's breach of contract claim is that evidence of the oral "management" agreement is precluded by the parol evidence rule because, as a prior oral agreement, it cannot serve to vary or contradict the price terms of more than one thousand written contracts evinced by confirmation slips. Specifically, Schroder claims that each of the individual conversions must be viewed as an independent contract, separate and apart from the management agreement pursuant to which all conversions were effectuated. Viewed as such, Schroder argues that because it sent CSAV a written confirmation of each conversion, setting forth the actual numerical rate at which the particular conversion was made, the parol evidence rule precludes CSAV from contradicting those written terms and arguing that the excessive rates charged by Schroder breached the alleged oral agreement. For this proposition, Schroder relies almost exclusively on *Intershoe, Inc. v. Bankers Trust Co.*, 77 N.Y.2d 517, 569 N.Y.S.2d 333, 571 N.E.2d 641 (1991), a 1991 New York Court of Appeals case which, according to Schroder, applied N.Y. U.C.C.

---

**19.** The provisions of Article 2 governing "transactions in goods," N.Y.U.C.C. § 2–102, also apply to foreign currency transactions where, as here, foreign currency is traded as a commodity. *See Intershoe, Inc. v. Bankers Trust Co.*, 77 N.Y.2d 517, 521, 569 N.Y.S.2d 333, 336, 571 N.E.2d 641, 644 (1991) ("[t]here seems to be no question that the U.C.C. applies to foreign currency transaction"); *accord* N.Y.U.C.C. § 2–105 official comment 1 (U.C.C.'s definition of "goods" is intended to cover the sale of money when money is being treated as a commodity).

However, Article 2 only applies to contracts for the sale of goods. It does not apply to contracts for services. *See* N.Y.U.C.C. § 2–102. Thus, CSAV contends that Article 2 does not apply because the contract at issue, the management agreement that governs all the individual conversions, is a contract for services. According to CSAV, it did not just order goods, rather, it entrusted Schroder with the management of its European currency conversion program.

In order to determine whether a contract is for the sale of goods, or for services, a court must look at the "essence" or main objective of the agreement. If the provision of services or rendition of other performance predominates and is not merely incidental or collateral to the sale of goods, then the U.C.C. does not apply. *Dynamics Corp. of America v. International Harvester Co.*, 429 F.Supp. 341, 346 (S.D.N.Y.1977); *North American Leisure Corp. v. A & B Duplicators, Ltd.*, 468 F.2d 695, 697 (2d Cir.1972); *Schenectady Steel Co., Inc. v. Bruno Trimpoli General Construction Co., Inc.*, 43 A.D.2d 234, 350 N.Y.S.2d 920, 922 (3d Dept.), *aff'd*, 34 N.Y.2d 939, 359 N.Y.S.2d 560, 316 N.E.2d 875 (1974).

In this case, the Court finds that even if CSAV is correct and it is the overarching management agreement that is at issue, the contract is in "essence" a contract for the sale of goods. Schroder rendered services only to facilitate sales and purchases of foreign currency, making the provision of services incidental to the contract(s) for the sale of goods. As CSAV's fact witness, Frederick Seeley testified, "Schroder bought and sold foreign exchange to CSAV" and "[t]hat's what happened" between the parties. Seeley Tr., at 35–36. Further, CSAV cites no evidence to suggest that Schroder rendered any management services for any purpose aside from facilitating the sales and purchases of currency. The record indicates that the sole reason Schroder provided CSAV with any services was to facilitate the transactions in goods. *See* Hamway Tr., at 176 (goal of envisioned cash management arrangement was for CSAV to "engage in F/X conversions and get dollars available to them on the most efficient, fast basis"); Hasselbach Tr., at 362 (nostro accounts used by CSAV were selected to "expedite the payment" on foreign exchange transactions so as to move "dollars quicker to the client's accounts").

Thus, the Court finds that Article 2 of the U.C.C. applies to the relationship between the parties. Since the parol evidence rule set forth in Article 2, however, is substantially similar to the common law parol evidence rule, this determination has implications primarily for Schroder's contention that a portion of CSAV's contract claim is barred by the statute of limitations. *See infra*, at 433–34.

**20.** The statute includes two exceptions for evidence by which written terms "may be explained or supplemented," but CSAV has not contended that either exception applies to the present case.

§ 2–202 to written foreign exchange confirmations similar to Schroder's.

In *Intershoe,* the plaintiff ("Intershoe") was a shoe importer that used foreign currencies in transacting its business. On March 13, 1985, Intershoe entered into a foreign currency transaction over the phone with defendant Bankers Trust Co. ("Bankers"), involving Italian lira. Following the telephone conversation, Bankers sent Intershoe a written confirmation which stated: "WE HAVE BOUGHT FROM YOU ITL 537,750,000" and "WE HAVE SOLD TO YOU USD 250,000.00." The confirmation also reflected the rate at which the transaction was completed, and stated that delivery of the lira was scheduled to take place some 7 and ½ months later. Intershoe's treasurer subsequently signed the confirmation and returned it to Bankers. *Intershoe,* 77 N.Y.2d at 520, 569 N.Y.S.2d at 334–35, 571 N.E.2d at 642–43.

Seven months later, as the value date arrived, Intershoe claimed that the confirmation it had signed mistakenly reflected that it was selling lira when the oral agreement had actually provided for Intershoe to purchase lira. Intershoe refused to pay the lira to Bankers, and Bankers was forced to purchase lira in the open market. *Intershoe,* 77 N.Y.2d at 520, 569 N.Y.S.2d at 335, 571 N.E.2d at 643.

The New York Court of Appeals held that the parol evidence rule prevented Intershoe from claiming that the deal was actually a purchase and not a sale of lira. The court reasoned that the essential terms of the transaction were plainly set forth in the confirmation slip which Intershoe had signed and returned, signifying its acceptance of those terms. *Intershoe,* 77 N.Y.2d at 522, 569 N.Y.S.2d at 336, 571 N.E.2d at 644. The court also stated that "it is difficult to imagine words which could more clearly demonstrate the final expression of the parties' agreement than 'WE HAVE BOUGHT FROM YOU ITL 537,750,000' and 'WE HAVE SOLD TO YOU USD 250,-000.00.'" *Id.* Finally, the court concluded that:

> Where as here, the form and content of the confirmation slip suggest nothing other than that it was intended to be the final expression of the parties' agreement as to the terms set forth and where there is no evidence indicating that this was not so, U.C.C. 2–202 bars parol evidence of contradictory terms.

*Id.*

Schroder contends that since the confirmations at issue in the current case contain the same key language, the Court should similarly conclude that they were intended to be final expressions of the parties' agreement, barring parol evidence of contradictory terms.

■ The determination as to whether a writing was intended as a complete and exclusive statement of an agreement is a function of the court. *See FMC Corp. v. Seal Tape Ltd., Inc.,* 90 Misc.2d 1043, 396 N.Y.S.2d 993, 996 (1977) (citing *Pennsylvania Gas Co. v. Secord Brothers, Inc.,* 73 Misc.2d 1031, 343 N.Y.S.2d 256 (1973), *aff'd,* 44 A.D.2d 906, 357 N.Y.S.2d 702 (1974)). In making this determination, the court is to measure the completeness of the written instrument itself, rather than the subjective attitude of the parties. *Phillip Brothers, etc. v. El Salto, S.A.,* 487 F.Supp. 91, 94 (S.D.N.Y.1980).

While it is true that Schroder's confirmations contained the same key language relied upon by the court in *Intershoe,* and Schroder has produced evidence to indicate that each written confirmation stated the terms of a contract for the purchase and sale of currency, *see* Grez Tr., at 66; Geis Tr., at 128; Suttie Tr., at 65, 67; Seeley Tr., at 44, the Court finds that in this case, the confirmations cannot be deemed an integration intended as a final expression of the parties' agreement.

In *Intershoe,* which involved a single transaction, it was undisputed that the written confirmation was intended to reflect the individual transaction to which the parties had orally agreed. Indeed, Intershoe had unequivocally signified its acceptance of the terms set forth in the confirmation by signing and returning it to Bankers. In this case, by contrast, the confirmations were not intended to reflect the terms of the alleged overriding agreement pursuant

to which in excess of one thousand transactions were conducted. Nor were they intended to reflect a single transaction to which both parties had orally agreed. Rather, each confirmation was intended to reflect the terms at which one of hundreds of currency conversions contemplated by the oral agreement had been completed. Grez Tr., at 195.

In addition, here there was no negotiation of the terms that were later set forth in the written confirmations, nor was there any prior agreement to the terms by CSAV. And whereas in *Intershoe* the parties specifically agreed to the terms that were confirmed in writing, in this case Schroder executed the currency conversions without prior input or agreement from CSAV, Geis Tr., at 154–58, 352–53; Grez Tr., at 48–49, 52–54; Suttie Tr., at 36–37, 43, 50–52, 98–99; Tygier Aff., at ¶¶ 3, 4, 7, and then merely informed CSAV of the details of the transaction via the written confirmations.

Furthermore, it is undisputed that in this case CSAV never signed or otherwise assented to the written confirmations sent by Schroder. It is true that Schroder's written confirmations stated that "[t]his confirmation is valid without signature," *see* Exhibit "D" to Def. Appendix, but the absence of CSAV's signature on the written confirmations further distinguishes this case from *Intershoe* and makes it impossible for the Court to determine, as a matter of law, that these confirmations were intended to be "the final expression of the parties' agreement as to the terms set forth." *Intershoe*, 77 N.Y.2d at 522, 569 N.Y.S.2d at 336, 571 N.E.2d at 644.[21]

Finally, the circumstances of the parties' longstanding relationship indicates that the confirmations should not be considered the complete and exclusive statement of the parties' agreement. The fact that Schroder set up accounts in Europe to accept CSAV's European currencies, and CSAV remitted its currencies exclusively to Schroder establish that the agreement between the parties had much more to it than was reflected in the confirmations sent to CSAV. As such, the Court finds that evidence of the oral agreement is not barred by the parol evidence rule.[22]

Accordingly, the Court concludes that Schroder's motion for summary judgment on CSAV's breach of contract claim should be denied.

## IV. Statute of Limitations

Because only CSAV's breach of contract claim remains, it is only necessary to discuss whether a portion of that claim is barred by the applicable statute of limitations as Schroder contends.

As a preliminary matter, the Court must determine when CSAV's action was commenced for purposes of the relevant statute of limitations. CSAV filed the instant action on November 9, 1990 and served Schroder on November 13, 1990. Since New York law provides that an action is commenced when the summons is served on the defendant,[23] CSAV's breach of contract claim was commenced on November 13, 1990. New York Civil Practice

---

**21.** It appears that Schroder also contends that CSAV's acceptance of the U.S. dollars and its failure to register any complaint about the rates are equivalent to CSAV's signature as they indicate assent to each transaction. CSAV's assent, however, is not the issue. The issue is whether the written confirmations were intended to be the final expression of the parties' agreement, and CSAV's actions do not indicate that these confirmations were so intended. Whereas, in *Intershoe*, the signature on the confirmation provided such evidence.

**22.** Because the Court has determined, as a matter of law, that the confirmations were not intended to be the final expression of the parties' agreement, it is not necessary to address the secondary issue of whether evidence of the oral agreement would contradict the price terms set forth in writing on each confirmation.

**23.** When the claim asserted in federal court is on a right created by state law, provisions of the state statute of limitations as to how the action is commenced, rather than Rule 3 of the Federal Rules of Civil Procedure, control in the federal court. *See Ragan v. Merchants Transfer & Warehouse Company,* 337 U.S. 530, 69 S.Ct. 1233, 93 L.Ed. 1520 (1949); 4 C. Wright & A. Miller, *Federal Practice and Procedure* §§ 1056–56 (1987).

**434**

and Rules ("CPLR") § 203(b)(1) (McKinney 1972).

■ Article 2 of the U.C.C.[24] provides that an action for breach of contract must be brought within four years of its accrual. N.Y. U.C.C. § 2–725(1). Thus, CSAV's breach of contract claim is barred, as a matter of law, insofar as it alleges any breach occurring prior to November 13, 1986.

### Conclusion

For the reasons set forth above, Schroder's motion, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for an order granting it summary judgment is granted as to CSAV's common law fraud, RICO, and breach of fiduciary duty claims, and denied as to CSAV's breach of contract claim. However, CSAV's contract claim is barred by the applicable statute of limitations to the extent that it alleges any breach occurring prior to November 13, 1986.

SO ORDERED.

---

**24.** As discussed above, the provisions of Article 2 apply to all aspects of the parties' relationship.